**No. 15-1327**
_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

**BELLAGIO, LLC,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,**
Respondent,

_____

ON PETITION FOR REVIEW FROM THE DECISION AND ORDER OF THE
NATIONAL LABOR RELATIONS BOARD AND CROSS-APPLICATION FOR
ENFORCEMENT OF THE DECISION AND ORDER IN CONSOLIDATED
CASE NUMBERS 28-CA-106634 AND 28-CA-107374
_____

**PETITIONER'S CORRECTED OPENING BRIEF**
_____

Paul T. Trimmer
JACKSON LEWIS P.C.
3800 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169
(702) 921-2460
(702) 921-2461 (Facsimile)
Email:  trimmerp@jacksonlewis.com

## <u>CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW<br>AND RELATED CASES</u>

Petitioner Bellagio, LLC is a resort hotel/casino located in Las Vegas, Nevada. It is a wholly owned subsidiary of MGM Resorts International. Bellagio does not issue debt or equity securities to the public nor does it have subsidiaries which issue shares or debt to the public. MGM Resorts International is publicly traded on the New York Stock Exchange.

This Petition to Vacate the National Labor Relations Board's Decision and Order, No. 15-1327, has been consolidated with the Board's cross-petition to enforce the same decision and order. The ruling under review is the Board's August 20, 2015 Decision and Order in *Bellagio, LLC and Gabor Garner and Najia Zaidi*, Case Nos. 28-CA-106634 and 28-CA-107374, reported at 362 NLRB No. 175. Because the Board affirmed dismissal of allegations pertaining to the Charging Party Najia Zaidi, however, only the portions of the Decision and Order which pertain to Charging Party Gabor Garner are before the Court.

# TABLE OF CONTENTS

**TABLE OF CASES, STATUTES AND OTHER AUTHORITIES** .............. iii

**STATUTES AND REGULATIONS** ................................................. v

**GLOSSARY** ................................................................................ vi

**JURISDICTIONAL STATEMENT** ................................................ 1

**STATEMENT OF ISSUES** .......................................................... 2

**STATEMENT OF THE CASE** ...................................................... 6

A.    Background Facts ...................................................................... 7

    1.    Bellagio Is A Five Diamond Resort Committed To Customer Service Of The Highest Level ....................................................... 7

    2.    The terms and conditions of Garner's employment were governed by Bellagio's collective bargaining agreement with Culinary Workers Union Local 226, and under the terms of that agreement, suspensions pending investigation do not constitute discipline. ........................... 8

B.    Events Giving Rise To The Case .............................................. 10

    1.    On May 12, 2014, a guest named Matthew Poland complained that Garner solicited him for a tip ......................................................... 10

    2.    Wiedmeyer arranged to interview Garner about the Poland's complaint on May 13, 2013. When Wiedmeyer was unable to procure a shop steward to provide Garner with representation, Wiedmeyer terminated the interview and placed Garner on SPI. ...................... 11

    3.    Garner did not leave property immediately. Instead, he lingered in the Bell Department Dispatch room. When Wiedmeyer encountered him there, Wiedmeyer instructed him to leave ..................................... 15

i

4.    Bellagio Continued Garner's Due Process Meeting On May 14, 2013. Garner was returned to work immediately and paid for the time he missed. ...........................................................................16

C.    Procedural History And The Decisions Below ........................................ 19

**STANDARD OF REVIEW** ...............................................................25

**SUMMARY OF ARGUMENT** ........................................................26

**ARGUMENT** ...................................................................................30

A.    The Board's Determination That Bellagio Violated Section 8(a)(1) of the Act Because Wiedmeyer Denied Garner's Request to be Represented By the Union During the May 13th Meeting Is Not Supported By Substantial Evidence...................................................................................31

B.    The Board's Determination That Bellagio Violated Section 8(a)(1) of the Act General Counsel By Placing Garner On SPI Should Be Vacated ......34

C.    The Board's Determination That Bellagio Violated Section 8(a)(1) of the Act Because Wiedmeyer Asked Garner To Leave The Premises After Being Placed On SPI Should Be Vacated ...........................................................41

D.    The Board's Determination That Bellagio Violated Section 8(a)(1) of the Act Because Wiedmeyer Observed Garner Speaking To A Coworker In The Bell Department Dispatch Room Should Be Vacated..............................42

E.    The Board's Recommended Order and Notice Cannot Be Enforced.  They Are Unlawful And Violate Section 10(e) Of The Act Because They Are Not Sufficiently Tailored To The Circumstances Of This Case ...............44

**CONCLUSION**..................................................................................46

ii

# TABLE OF CASES, STATUTES AND OTHER AUTHORITIES

## CASES

*735 Putnam Pike Operations, LLC v. NLRB*,
474 Fed. Appx. 782, 783 (D.C. Cir. 2012) ..........................................37

*\*Aladdin Gaming, LLC*, 345 NLRB 585, 586 (2005) ............................. 3, 30, 43

*Alan Ritchey*, 359 NLRB No. 40 (2012)..............................................36

*Coca-Cola Bottling Co.*, 227 NLRB 1276, 1277 (1977)....................................45

*Eddyleon Chocolate Co.*, 301 NLRB 887, 888 (1991)........................................30

*Frenchtown Acquisition Co. v. NLRB*,
683 F.3d 298, 306-309 (6th Cir. 2012) ................................................37

*Holsum de P.R., Inc.*, 344 NLRB 694, 708-709 (2005) ......................................43

*J.J. Cassone Bakery, Inc.*, 345 NLRB No. 111 (2005)........................................ 26

*\*Jackson Hosp. Corp. v. NLRB*,
645 F.3d 1137, 1142 (D.C. Cir. 2011) ........................................ 25, 34

*Jochims v. NLRB*, 480 F.3d 1161, 1170-1171 (D.C. Cir. 2007)................... 26, 37

*Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015)............................................37

*KBM Electronics, Inc.*, 218 NLRB 1352, 1359 (1975) ......................................30

*Lamar Central Outdoor,* 343 NLRB 261, 265 (2004)....................................4, 42

*Lancaster Fairfield Community Hospital*, 311 NLRB 401 (1993) ....................36

*\*NLRB v. J. Weingarten, Inc.*,
420 U.S. 251 (1975)................................2, 6, 11, 19-22, 24, 26-29, 31-35, 39-41

*NLRB v. Joseph Antell, Inc.*, 358 F.2d 880, 882 (1st Cir. 1966) ........................31

*Nu-Line Industries, Inc.*, 302 NLRB 1, 2-3 (1991) .............................................43

*\*Pacific Gas & Elec. Co.*, 253 NLRB 1143 (1981) ..................................... 33, 39

*Oates Bros. Fruit & Produce*, 191 NLRB 736 (1971) ........................................43

*\*Paul Mueller, Co.*, 332 NLRB 1350 (2000) ............................................... 30, 42

*Promedica Health Systems, Inc.*, 343 NLRB 1351, 1352 (2004).......................28

*\*Roadway Express*, 246 NLRB 1127, 1130 (1979) ........................... 4, 28, 33, 41

*Sierra Bullets*, NLRB 242, 243 (2003) .......................................................... 30, 43

*Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002)...................................37

*Sunshine Piping, Inc.*, 350 NLRB 1186, 1193-1194 (2007) ...............................43

*Trover Clinic*, 280 NLRB 6, 16 (1986) ..............................................................28

*Veolia Transp. Servs.*, 363 NLRB No. 98 (Jan. 20, 2016) ..................................36

*Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) .............................38

*\*Wright Line*, 251 NLRB at 1089................................................. 3, 23, 24, 34, 40

## STATUTES AND REGULATIONS

29 U.S.C. § 157:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3) of [29 U.S.C. § 158(a)(3)].

29 U.S.C. § 158:

(a) Unfair labor practices by employer

It shall be an unfair labor practice for an employer –

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 157 of this title; …

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization…

# GLOSSARY

"ALJ" or "Judge" means administrative law judge.

"ALJD" means Administrative Law Judge Decision.

"Bellman" refers to a hotel employee who helps patrons with their luggage while checking in or out.

"Charging Party" and "Garner" refer to Gabor "Bryan" Garner.

"Decision and Order" or the "Decision" means the National Labor Relations Board's August 20, 2015 Decision and Order in *Bellagio, LLC and Gabor Garner and Najia Zaidi,* Case Nos. 28-CA-106634 and 28-CA-107374, reported at 362 NLRB No. 175.

"NLRA" or the "Act" means the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq.*

"NLRB," the "Board" or "Respondent" means Respondent National Labor Relations Board.

References to Transcript Pages and Exhibits refer to the Hearing Transcript[1] and Exhibits entered into the record during the unfair labor practice hearing which took place on January 6, 7 and 8 2014.  Transcript citations refer to the page and line number of the testimony.  Respondent's Exhibits are referred to as "RX --" and General Counsel Exhibits are referred to as "GCX --."

---

[1]    Petitioner will be submitting excerpts of the record containing the portions of the record cited in the Opening Brief, and will submit a brief with cites to the pages in that compendium at that time.

# JURISDICTIONAL STATEMENT

Bellagio has petitioned the Court to review and set aside those portions of the National Labor Relations Board's August 20, 2015 Decision and Order in *Bellagio, LLC and Gabor Garner and Najia Zaidi*, Case Nos. 28-CA-106634 and 28-CA-107374, reported at 362 NLRB No. 175, which pertain to Gabor Garner. The portions of the Decision and Order pertaining to Ms. Zaidi are not under review. The Board's Decision and Order is final and appealable, and the Court has jurisdiction over the appeal pursuant to 29 U.S.C. § 160(f).

## STATEMENT OF THE ISSUES

1.        Under the Supreme Court's decision in *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251 (1975), when an employee who is represented by a union requests a union representative during an investigatory interview, the employer must either grant the request, discontinue the interview, or offer the employee the choice of proceeding without union representation or foregoing the benefit of participating in the interview and conveying his or her side of the story.

The first issue before the Court is whether the Board's finding that Bellagio violated the Charging Party's *Weingarten* right by interrogating him after he requested union representation should be denied enforcement because it is not supported by substantial evidence given that a) the Board's claimed reliance on the ALJ's factual findings is impossible because the ALJ's decision, by inadvertence or design, contained no findings of fact regarding the *Weingarten* violation; b) Garner admitted that once he requested a *Weingarten* representative, all questioning stopped (Tr. 185:21-24 "Q: Isn't it true that after you requested a *Weingarten* representative that Brian Wiedmeyer stopped asking you any questions about the guest complaint? A: Yes, that's true."); c) the Bellagio supervisor conducting the meeting, Brian Wiedmeyer, agreed to allow Garner to obtain a shop steward and attempted to locate one on Garner's behalf; and, d) Wiedmeyer

2

discontinued the interview after he was unable to identify and locate a shop steward to provide Garner with representation.

2.    To demonstrate that an employee was disciplined because the employee engaged in protected concerted activity under the Board's *Wright Line* test, the General Counsel must first establish a *prima facie* case that the employee was subjected to an adverse employment action and that the employee's protected conduct was a motivating factor.  251 NLRB 1083 (1980), *enfd.* 662 F.2d 889 (1st Cir. 1981), approved in *NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393 (1983).

The second issue before the Court is whether the Board's Decision and Order should be denied enforcement because Bellagio did not initiate an adverse employment action when Wiedmeyer ended the interview and placed Garner on a paid, non-disciplinary suspension pending investigation ("SPI") so that the Company, Garner and Garner's union could meet the following day to complete the investigatory interview.

3.    "A supervisor's routine observation of employees engaged in open Section 7 activity on company property does not constitute unlawful surveillance" in violation of Section 8(a)(1) of the Act.  *Aladdin Gaming, LLC*, 345 NLRB 585, 585-586 (2005).

3

Therefore, the third issue before the Court is whether the Board's finding that Bellagio engaged in unlawful surveillance when Wiedmeyer observed Garner speaking to a coworker in a high traffic work area -- specifically, the Bell Desk dispatch room where bellmen wait to be assigned to room calls to collect guest luggage -- should be denied enforcement because Wiedmeyer did nothing other than observe Wiedmeyer engaged in open Section 7 activity in a public work area.

4.     Under the Board's decision in *Roadway Express,* 246 NLRB 1127, 1130 (1979), an employer is entitled to suspend and eject from the workplace employees who refuse to participate in workplace investigations.  Thus, the fourth issue before the Court is whether the Board's finding that Bellagio imposed an unlawful directive when Wiedmeyer, having placed Garner on SPI, instructed Garner to stop talking to his coworker and leave the premises should be denied enforcement because it is contrary to Board precedent which protects an employer's right to remove suspended employees from its property.

5.     Due process requires that Bellagio has "meaningful notice of a charge and a full and fair opportunity to litigate it."  *Lamar Central Outdoor,* 343 NLRB 261, 265 (2004) (General Counsel may not change his theory of litigation without amending his complaint, because doing so "would violate fundamental principles of procedural due process[.]").  The fifth issue before the Court is whether the Board's finding that Bellagio imposed an unlawful directive when Wiedmeyer

instructed Garner to stop talking to his coworker and leave the premises should be denied enforcement because the theory of liability on which the Board relied to sustain the violation -- that it was an unlawful coercive statement -- was not set forth in the General Counsel's complaint, not litigated in the hearing before the Administrative Law Judge, and not set forth in the ALJ's decision.

6.      The sixth issue before the Court is whether the Board's Order should be denied enforcement because its remedial provisions exceed the Board's authority under Section 10(e) of the Act and otherwise constitute an abuse of discretion because it is inconsistent with and not supported by the Board's findings.

## STATEMENT OF THE CASE

The Charging Party, Gabor Garner, is a bellman at the Bellagio, a five diamond resort on the Las Vegas Strip.  This case arises out of an incident which took place on May 12, 2013.  A customer accused Garner of holding out his hand, soliciting a tip, and then making a rude comment when the customer explained he did not have any cash on hand.  After the customer made the Company aware of the issue, Garner's direct supervisors, Front Services Supervisors Brian Wiedmeyer and Max Sanchez, arranged a meeting for May 13, 2013 so that they could get Garner's side of the story.

During that meeting, Garner requested a *Weingarten* representative. Although Garner knew the identity of the property's chief shop steward and how to locate her, he did not provide Wiedmeyer with that information.   When Wiedmeyer was unable to locate a steward so that the meeting could continue, he ended the interview and placed Garner on a paid, non-disciplinary suspension pending investigation ("SPI") and told him to leave the property.  Minutes later, when Wiedmeyer encountered Garner in the Bell Department dispatch room, he told Wiedmeyer to stop talking to his coworker and leave the premises.

Because one of Bellagio's grounds for appeal is that the Board's findings are not supported by substantial evidence, Sections A and B set forth the relevant

6

record testimony and evidence. Section C describes the proceedings below, including the Board's Decision and Order.

**A.    Background Facts.**

> **1.    Bellagio Is A Five Diamond Resort Committed To The Highest Level of Customer Service.**

Bellagio is a luxury hotel casino on the Las Vegas Strip.  It prides itself on world-class guest service.  414:21-415:14.  Its status as an AAA Five Diamond resort[2] is an essential component of its identity and its business model.  *Id.*  Its guests place a premium on the Company's customer service, and its employees' actions determine whether guests will choose to return to Bellagio or to patronize a competitor in the future.  *Id.*

Charles Berry, Director of Front Services, explained that the level of service delivered by the Bell Department is critical to ensuring that Bellagio maintains Five Diamond Status.  414:21-415:14.  Bellpersons receive guests when they arrive, transport luggage to the guest's room, retrieve luggage from a guest's room at the end of the guest's stay, and load that luggage into the guest's transportation. *Id.*  They are frequently the first (and last) employees to interact with guests and they have access to guests' personal property and information.  *Id.*

---

[2]    A Five Diamond Resort provides "[u]ltimate luxury, sophistication and comfort with extraordinary physical attributes, meticulous personalized service, extensive amenities and impeccable standards of excellence."  *AAA Diamond Rating Definitions*, available online at: http://newsroom.aaa.com/diamond-ratings/diamond-rating-definitions/.

The Bell Department maintains policies and procedures designed to ensure that guests receive customer service. Posters located throughout the work area remind Bellmen to give each guest a proper departing salutation at the closure of each service transaction, such as "Hope you had a nice stay with us and we hope to see you again." RX 6. The posters are supplemented by detailed written policies and practical training. 419:14-422:3; RX 14 at 2-4. And, because soliciting a tip is, for purposes of customer service, a capital offense, Bellagio maintains Policy #D-39, which provides:

> At no time are employees to solicit, hustle, or intimidate a guest in order to receive a gratuity. Employees will not suggest or indicate in any way that a gratuity is required, expected or not sufficient.

RX 15; 422:10-423:22.

**2.    The terms and conditions of Garner's employment were governed by Bellagio's collective bargaining agreement with Culinary Workers Union Local 226, and under the terms of that agreement, suspensions pending investigation do not constitute discipline.**

As noted above, the Charging Party Bryan Garner, is a Bellman who works in the Bell Department. He is represented for purposes of collective bargaining by Culinary Workers Union Local 226 (the "Union"). During the relevant time periods, the terms and conditions of his employment were governed by the Company's collective bargaining agreement with the Union. JX 1; 629:3-8. As Susan Moore, Bellagio's Employee Relations Manager, explained, the CBA

8

"impacts everything that we do with employees. This supersedes our handbook and policies and procedures."  629:7-8.

Article 6 of the CBA sets forth the limits of Bellagio's ability to impose discipline.   JX 1 at 9; 629:12-630:25.   Suspensions pending investigations, or SPI's, do not constitute discipline under the collective bargaining agreement. 629:12-630:25 (Testimony by Bellagio's Employee Relations Manager Susan Moore).  SPI's are non-disciplinary and are used when circumstances indicate that an employee needs to be removed from the work environment, but further investigation is necessary.  *Id.*  Employees are paid for the time that they spend away from work on SPI.  Issuance of an SPI has **no impact** on the terms and conditions of employment, a fact confirmed by Bellagio and the Union's agreement that SPI's **cannot be grieved under the collective bargaining agreement.** *Id.*

For these reasons, SPI's are not tracked or retained in any way.  They do not appear in employee personnel files as prior discipline or for any other purpose, and employees who are placed on SPI are compensated for the time they are out of work. 77:15-23 (Wiedmeyer); RX 32 (Garner's PAN history); RX 33 (Garner's pay history for May 13-15, 2013);  631:14-634:19; *see also* RX 17 (Garner's May 15, 2013 verbal warning which does not list the SPI as prior discipline).

**B.     The Events Giving Rise To The Case.**

**1.     On May 12, 2014, a guest named Matthew Poland complained that Garner solicited him for a tip.**

On May 12, 2013, Bellagio guest Matthew Poland elected to store his luggage after checking out of his hotel room so that he could continue to gamble before departing the property. GCX 2. When he approached the Bell desk, Garner was there to receive the luggage. 554:7-557:2. According to Poland, Garner "acted as if he was waiting for a tip . . [a]fter a long pause waiting for us to pull out our wallets, I left with my claim ticket and after I got 5 ft away, he said 'Appreciate it.'" GCX 2. Poland was offended: "I was so upset by it that instead of gambling a little longer (the reason for which I dropped off my bags in the first [place]), I decided to contact MLife. . ." GCX 2. Poland went on, "[s]o instead of making the hotel money, I left upset, something I usually don't feel walking out of the Bellagio." *Id.*

When Poland contacted the MLife players' club desk at Bellagio, the representative called Garner's supervisor, Brian Wiedmeyer. 554:7-557:2. Wiedmeyer spoke to the guest over the phone and then met with him in person. *Id.* Poland informed Wiedmeyer him that the Bellperson who took his bags had held out his hand and solicited a gratuity. *Id.*; *see also* GCX 3(a). Poland also told Wiedmeyer that the Bellperson "sarcastically" said "I appreciate it" when Poland turned to walk away. *Id.* Wiedmeyer apologized, asked Poland to complete a

10

written statement, and then escorted him and his luggage to his car. *Id.*; RX 31. By the time Wiedmeyer completed his meeting with the guest, Garner's shift was over.

> **2.     Wiedmeyer arranged to interview Garner about the Poland's complaint on May 13, 2013. When Wiedmeyer was unable to procure a shop steward to provide Garner with representation, Wiedmeyer terminated the interview and placed Garner on SPI.**

Wiedmeyer arranged to meet with Garner the following day, May 13, 2013, at the end of Garner's shift. They met in one of the offices adjacent to the Bell Dispatch area, and Wiedmeyer invited another Front Services Supervisor, Max Sanchez, to participate. 20:5-11; 88:18-24. Wiedmeyer started the meeting by describing the complaint from Poland and asking Garner to explain what happened. 20:5-11; 88:18-24. Garner denied the allegations, initially claiming the statement was a lie, and then claiming that he did not recall the situation. *Id.*; GCX 22.

Garner asked whether the meeting could lead to discipline. 23:7-11; 29:5-23. Wiedmeyer responded that it could, but he did not know for certain because he had not heard Garner's side of the story. 29:5-23; GCX 3(a); GCX 4. At that point, Garner demanded that Wiedmeyer obtain a shop steward. 30:1-31:10. During the hearing before the ALJ, **Garner admitted that once he asked Wiedmeyer for a shop steward, all questioning ceased.** *See* 185:21-24 ("Q: Isn't it true that after you requested a *Weingarten* representative that Brian

11

Wiedmeyer stopped asking you any questions about the guest complaint? A: Yes, that's true."); 32:6-7 (Wiedmeyer); 90:25-91:2 (Sanchez); 115:6 (Garner).

Wiedmeyer agreed to Garner's request. He told Garner he did not know the identity of any shop stewards then on duty, but that Garner should "go ahead" and find one and that he would wait to continue the meeting until the steward arrived. 32:6-7. Although Garner in fact knew how to locate a shop steward -- he testified during the hearing that he knew that a shop steward named Cherise was "in charge" of all of the shop stewards on property and that she was located in the employee dining room -- Garner refused. 32:4-9 (Wiedmeyer); 125:22-25 (Garner discussing Cherise); 159:18-161:19 (same). Garner insisted that Wiedmeyer was obligated to locate a steward for him.[3] 32:4-9. He became "very condescending, like almost as to embarrass" Wiedmeyer, 93:17, became increasingly agitated, 36:20-37:4, 37:12-15, pointed his finger at Sanchez and asserted that Bellagio maintained a "list" of shop stewards and that Wiedmeyer was required to locate a steward for Garner by selecting one from the list. 94:7-94:22.

---

[3]    Garner contends that he was "calm" throughout the meeting, that he never raised his voice, and that he never pointed at Sanchez. 151:15-152:9. As Member Johnson concluded in his dissent, this was implausible and contrary to the weight of the record. One of the General Counsel's witnesses conceded that at the end of the meeting Garner was "distraught," and another stated that Garner was upset and talking loud enough to be heard around the corner, a distance of at least thirty feet. 213:22-241:22. Garner was "agitated," calling the guest a "liar". 623:2-8.

12

Wiedmeyer was not aware of such a "list," but in an attempt to end the confrontation, Wiedmeyer and Sanchez exited the room and contacted Human Resources. 32:4-34:7. Wiedmeyer explained Garner's "temperament and agitation levels were just going higher and higher throughout this thing until [he] dismissed himself to call ER." 37:12-15. Wiedmeyer spoke to Jessica Harbaugh, a junior member of the Employee Relations department, and the only person who was in the office at the time (others were out attending a training session). 34:15-35:10. Harbaugh confirmed that there was no list of shop stewards available and that she did not know how to contact a shop steward at that time. *Id.*

Wiedmeyer had been concerned about Garner's behavior before he left the room to call HR because Garner already had begun to insist that he was "going back to work" if Wiedmeyer could not locate a steward. 36:20-37:4; 37:8-11. When Wiedmeyer returned to the room, Wiedmeyer informed Garner could also ask a coworker to attend the meeting as a representative. 44:24-45:3. Garner declined, so Wiedmeyer ended the interview and placed Garner on SPI. From his perspective, he had no choice:

> [Garner] was extremely agitated and in no position to be in a guest service capacity and I would be placing him on SPI because he was refusing to contact a steward and basically telling me he was going back to work and I couldn't allow him to go back on the floor.

13

36:20-37:4; *see also* 51:20-52:1 (Wiedmeyer discussing need to complete investigation).

Sanchez agreed. Allowing Garner to return to the floor would have negative consequences for both the Company and Garner:

> His state of mind, he was very agitated and, you know, in guest service there's an aura about employees when they are upset and that's the last thing or you can get the employee even into a worse jam where he may say something because he's already angry. So regardless of whether it had been Bryan or any other employee, he would not have been allowed to go back on the floor at that moment.

623:2-8; *see also* GCX 3; GCX 4; GCX 25.

Wiedmeyer presented Garner with the SPI notice and explained its requirements. GCX 25; 50:13-15; 54:23-55:3. As provided in the SPI Notice:

> This is not a disciplinary action; it is a process that Bellagio uses to remove you from the work place in order to investigate a serious situation or policy infraction in which you may have been involved. …

> You will have the opportunity at a later date to attend and Investigational Meeting with an Employee Relations Representative to discuss your Suspension Pending Investigation. At this time, you must leave property. Employee Relations will contact you to schedule your Investigative Meeting and you must make yourself readily available for that meeting.

GCX 25(a).  Wiedmeyer instructed Garner to leave the property "immediately"
and advised him that Human Resources would be in contact in order to arrange to
continue the investigatory interview.  54:23-55:3; GCX 25.

### 3. Garner did not leave property immediately.  Instead, he lingered in the Bell Department Dispatch room.  When Wiedmeyer encountered him there, Wiedmeyer instructed him to leave.

Garner left the office.  Wiedmeyer and Sanchez did the same shortly
thereafter.  58:4-25.  Wiedmeyer proceeded down the hall which leads directly into
the Bell Department dispatch area.  58:17-59:7; RX 3, 4, and 5.  The Bell
Department dispatch area is where Bellmen wait to be dispatched to hotel rooms to
pick up luggage.  71:13-74:12 (noting that "99.9%" of all luggage at Bellagio
travels through the Dispatch area); 177:20-23 (Garner admitting anywhere from
one to twenty-five employees will be in the Dispatch Area at any given time
throughout the workday and that main tower luggage must travel through the
room).  All incoming and outgoing luggage to the main hotel tower is transported
through the Bell Department dispatch area, and several dispatch employees are
stationed at the dispatch desk at all times.  It is the figurative nerve center of the
department and employees constantly are entering and exiting the room throughout
the day.[4]  *Id.*

---

[4]     The Board referred to the Bell Department Dispatch area as the "break area."
*Decision* at 10.  The description is totally inaccurate and not supported by
substantial evidence.  The Bellagio has more than 3,000 hotel rooms in its main

When he entered the room, he saw Garner.  *Id.*  Garner was speaking loudly, leaning on a table.  58:17-59:7.  Wiedmeyer approached Garner and stated: "You need to leave."  60:7-23.  Garner shot back "are you telling me that I can't talk to other people" or words to that effect.  *Id.*  Because Wiedmeyer, as a supervisor, did not wish to reveal to the other employees that Garner was on SPI, even if Garner had already told them, Wiedmeyer said "in this situation, he had to leave."  *Id.*

Garner turned to depart, and because Wiedmeyer wanted to ensure that Garner was heading out towards the parking area, as opposed to back into the casino work area, Wiedmeyer walked approximately ten feet to the exit door and looked down the hallway.  61:6-12.  He waited a few moments, making certain that Garner was leaving the hotel, and then turned back into the dispatch room.  61:13.

### 4.  Bellagio Continued Garner's Due Process Meeting On May 14, 2013.  Garner was returned to work immediately and paid for the time he missed.

After Garner departed, Wiedmeyer contacted his supervisor and Employee Relations Manager Susan Moore and apprized them of the situation.  638:12-639:12.   Moore and Berry arranged for Garner to resume the investigatory meeting the following day, May 14th.  638:12-639:12.  This time, Garner utilized his knowledge of how to obtain a shop steward instead of obstinately -- and

---

tower.  *All* of the luggage from the main tower moves through the dispatch area. As noted above, employees are stationed there, waiting to be assigned.  They are not on "break."  71:13-74:12; 177:20-23.

wrongly -- insisting that Bellagio was required to provide him with one.  125:22-25; 159:18-161:19 (Garner).  On the morning of the due process meeting, he arranged for the aforementioned "Cherise" to meet him at Employee Relations so that he would have a shop steward.  125:22-25; 159:18-161:19.

When the meeting began, Garner requested that Bellagio provide a shop steward named Monica Smith.  638:12-639:12.  Like Wiedmeyer, Moore explained to Garner that it was his responsibility to obtain a steward, but in the interest of moving things along, Moore located Smith and secured her attendance at the meeting.  *Id.*  Once Smith arrived, Garner consulted with her, and the meeting began.  *Id.*  As Moore explained:

> It began with Bryan stating that Brian Wiedmeyer would not get him a shop steward, and then it continued into we talked about the guest complaint and what he remembered about the guest complaint, et cetera. And then at the end of the meeting, we talked about guest service and what's required of guest service.

639:14-19.

Berry, Director of Front Services, explained that Gamer had received several guest complaints over the years regarding rude behavior and/or soliciting tips.  Although Berry remained calm throughout, Garner once again became agitated and excited.  639:22-640:25.

Berry contacted Poland on May 15, 2013.  437:13-440:7; RX 18.  Berry wanted to speak to the guest himself and resolve the discrepancies presented by

Garner's account of the situation before he made any decision regarding discipline. *Id.* As Berry explained, he was struck by the guest's sincerity. 439:18-440:7. The guest acknowledged that he had not given Garner a tip, and explained that he was unable to tip because he had no cash. *Id.* The guest was still upset about the incident because he felt that he was a good, repeat customer at the Company, and he was surprised that he had been treated poorly at a place like Bellagio. *Id.*

Berry concluded that Garner's excuses had no merit. On May 15th, after the due process meeting, and in accordance with its progressive discipline policy, issued a verbal counseling to Garner for hustling tips and rude behavior in violation of Company policy. RX 17. Garner was returned to work and reminded of the importance of following Company and Department policies and procedures, including not hustling tips, not being rude and discourteous to guests, and to always provide a positive closing to all guest interactions, regardless whether he receives a tip. *Id.*

Garner was paid for all time off work. RX 32. The SPI was not tracked as discipline. RX 33. He did not file a grievance or challenge that the SPI was disciplinary and lacked just cause under the CBA. Instead, Garner filed his unfair labor practice charge approximately a month later, on June 6, 2013.

## C.  Procedural History And The Decisions Below.

Garner filed an unfair labor practice charge on June 6, 2013.  In the charge, he alleged that the Company violated his *Weingarten* right by supposedly denying his request for a shop steward during the aforementioned investigatory interview and that Wiedmeyer suspended him in retaliation for requesting a *Weingarten* representative.  Garner amended his charge on August 22, 2013, making two additional allegations: that his supervisor Wiedmeyer engaged in unlawful surveillance simply because Wiedmeyer observed Garner in a work area and that Wiedmeyer promulgated an oral rule prohibiting *all* employees from speaking about discipline in the workplace.

NLRB Region 28's Regional Director issued an administrative complaint on August 30, 2013.  Garner's charge was consolidated for administrative purposes with another unfair labor practice case lodged against Bellagio by an employee named Najia Zaidi.  With respect to Garner, the Complaint contained the following allegations:

- In paragraph 5(f), the General Counsel contended that Bellagio violated Garner's *Weingarten* rights because Front Services Supervisor "Brian Wiedmeyer … denied [Garner's request] to be represented by the Union during an interview" during a May 13, 2013 meeting.

- In paragraphs 5(i), (j) and (k), the General Counsel contended that Bellagio violated Section 8(a)(1) because it "suspended" Garner in retaliation for "refus[ing] to attend the [May 13th] meeting" and because Garner "assisted the Union and engaged in "concerted activities."

19

- In paragraph 5(l) the General Counsel asserted that the Company "orally promulgated and enforced an overly-broad and discriminatory rule prohibiting its employees from discussing the terms and conditions of employment[.]"

- In paragraph 5(m), the General Counsel contended that Bellagio engaged in unlawful "surveillance of employees engaged in union and concerted activities," because after Wiedmeyer had placed Garner on SPI, he came upon Garner in the dispatch room – the busiest work area in the Bellagio Front Services Department – and instructed him to leave.

The General Counsel never amended these allegations.

The consolidated cases were heard by Administrative Law Judge Robert A. Ringler on January 6-8, 2014. ALJ Ringler issued his Decision on March 20, 2014. He dismissed all of the Complaint allegations regarding Charging Party Zaidi. Decision 11:5-12:25. He found that Bellagio violated Section 8(a)(1) of the Act in four ways with respect to Charging Party Garner: (1) it denied Garner's *Weingarten* rights; (2) it unlawfully suspended Garner because he requested a *Weingarten* representative; (3) it unlawfully surveilled Garner in the Front Services Dispatch Room; and, (4) it orally promulgated an unlawful rule when Wiedmeyer instructed Garner to comply with the aforementioned SPI. *See* Decision 12:29-13:11.

Bellagio excepted to the ALJ's Decision on April 25, 2014. In those exceptions Bellagio noted, among many other things, that the ALJ had failed to make *any* findings of fact in support of his conclusion that Bellagio had violated Garner's *Weingarten* right. *See* Decision 2:38-4:27. The ALJ *did not* find that

20

Wiedmeyer continued to question Garner or press him for a statement after Garner requested union representation. The ALJ recounted Garner's credited testimony as follows:

> Garner recounted Wiedmeyer showing him the complaint. He recalled telling him to ask Employee Relations for a steward list, and suggesting that such a list might also be posted in Berry's office. He said that Wiedmeyer placed a statement in front of him and told him to fill it out, which he declined to do without a steward. He added that Wiedmeyer told him that he would simply SPI him and figure it out later. He said that Sanchez and Wiedmeyer eventually left the room to call Employee Relations and then issued the SPI upon returning. He denied becoming upset, or being emotionally unable to return to serving guests.

Decision at 3:31-37.

Bellagio filed timely exceptions on April 25, 2014. The Board affirmed portions of the ALJ's ruling on August 20, 2014 in a split decision. Members Pearce and McFerran did not address the ALJ's finding that Bellagio violated Garner's *Weingarten* right. Nor did they reference Garner's *admission* that Wiedmeyer ceased all questioning once Garner requested a shop steward. Decision at pp. 1-2. They nonetheless confirmed his ruling based on their readings of statements that Wiedmeyer, Garner and Max Sanchez had written at the time of the incident. *Id.* at fn. 1.

Member Johnson dissented from this holding because, in his view, the evidence did not establish a violation of the Act:

My colleagues find that rather than discontinuing the interview after Garner requested a union representative, Wiedmeyer continued to press Garner to complete a statement after Garner's request. But the judge did not find that Wiedmeyer sought to continue the interview, and both Wiedmeyer and Garner testified that Wiedmeyer asked no further questions after Garner's request. My colleagues rely on contemporaneous written accounts by Wiedmeyer, Max Sanchez, and Garner to find that Wiedmeyer continued to press Garner for a statement after Garner requested representation. But those accounts establish no such thing. Wiedmeyer's statement says: "I returned to inform [Garner] I could not locate his representation [sic] and he would have to. He again refused and refused to fill out a statement regarding the issue. I placed him on SPI so he could not return to work until the investigation had been completed. I explained the three possible outcomes of SPI, he signed, had no questions and left."

As my colleagues observe, Sanchez' and Garner's statements establish that Wiedmeyer informed Garner that Garner would be suspended pending investigation if he continued to refuse either to locate a representative for himself or to fill out a statement, and that Wiedmeyer thereafter did, in fact, suspend Garner pending investigation. These consistent contemporaneous accounts establish that Garner refused, throughout the interview, either to locate a representative for himself or to fill out a statement; they do not establish that Wiedmeyer sought to continue the interview after Garner's request. Accordingly, I cannot conclude that the General Counsel has carried his burden of proof on this issue, especially in the light of the unambiguous testimony to the contrary from both Wiedmeyer and Garner. Because Wiedmeyer discontinued the interview when Garner requested representation, the Respondent did not violate Garner's Weingarten right.

Decision at 4.

Member Johnson also dissented from the majority's conclusion that Bellagio violated the Act when it placed Wiedmeyer on SPI.   As he explained, placing Wiedmeyer on SPI did not constitute an adverse employment action, and therefore the General Counsel could not meet its prima facie burden under *Wright Line* as a matter of law:

> Nor can I join my colleagues in finding that the Respondent violated Section 8(a)(1) by issuing the SPI. Under *Wright Line* the General Counsel must make an initial showing that an employee's protected conduct was a motivating factor in an employer's decision to take an adverse action against the employee. Here, the General Counsel failed to make the threshold showing that the Respondent took an adverse action against Garner. My colleagues adopt the judge's summary finding that the SPI was disciplinary because it states that the investigation of which it is a part may result in discipline. But they fail to acknowledge that the SPI also states that one outcome of the investigation may be a return to work without disciplinary action and with compensation for any missed worktime. This is consistent with the title of the SPI; it is a suspension "pending investigation," not a suspension levied to make some disciplinary point. Specifically here, the SPI expressly states, in its first paragraph, that it is not a disciplinary action, but rather a part of the Respondent's investigatory process. My colleagues do not acknowledge record evidence that the Respondent neither considers SPIs disciplinary nor retains any record of them in employee personnel files. In this regard, Wiedmeyer's own contemporaneous account of the purpose of the SPI was "so [Garner] could not return to work until the investigation had been completed." (Emphasis added.) Thus, the SPI served merely as a functional pause in the investigation so that a union representative could be obtained and a statement

23

from Garner could then be lawfully taken, not as a sign of the Respondent's displeasure. That neither Garner nor the Respondent knew what the outcome of the investigation would be at the time the SPI was issued does not mean that the SPI constitutes an adverse employment action: an investigation is not itself discipline, whether or not discipline ultimately ensues. Finally, the Respondent levied no monetary penalty or detriment against Garner; it paid him for the work he missed because of the SPI. On this record, it is clear that the SPI was not disciplinary, and Garner suffered no adverse consequence because of its issuance. Therefore, the General Counsel has not made the initial showing required to find a violation under Wright Line.

As a policy matter, the Board would better fulfill our mission of promoting industrial peace by permitting an employer in a situation like this--where an employee has been accused of a serious infraction and circumstances beyond the control of the employer prevent an immediate investigatory interview--to send the employee home pending the prompt completion of the investigation. For example, the immediate return to the workplace of an angry employee could result in disruption of the employer's business, damage to customer relations, or further incidents that might themselves require discipline. An employer should be allowed to make that judgment call as to an employee's state of mind.  I regret that my colleagues' failure to recognize commonsense boundaries for Weingarten obligations here have transformed them into an unworkable stricture for employers that are faced with the sudden need to investigate a workplace incident, a scenario which happens all too frequently in the modern world. This unfortunate outcome makes Weingarten a stumbling block to industrial peace, rather than its intended guarantor.

Decision at 4-5 (footnotes omitted).

The Board did not sustain the ALJ's conclusion that Wiedmeyer promulgated an unlawful oral rule when he instructed Garner to cease talking to his coworker and leave the premises. Decision at 1, fn. 3. It nonetheless sustained the ALJ's finding that Bellagio violated Section 8(a)(1) by adopting a new legal theory that had not been presented in the Complaint, had not been pursued by the General Counsel, and had not been litigated during the hearing: that Wiedmeyer engaged in independently "coercive conduct to compel Garner to cease speaking to coworkers about his discipline." *Id.*

The Board affirmed the ALJ's conclusion that Wiedmeyer engaged in unlawful surveillance, but it did not address Bellagio's exceptions to that holding. It did not explain how its precedents permitted a finding that Wiedmeyer "surveilled" Garner when, having just placed him on SPI, he observed Garner while walking through the Bell Dispatch area and instructed him to leave the premises. *See* Decision at pp. 1-4.

Bellagio petitioned to vacate the Board's Decision on September 18, 2015.

## **STANDARD OF REVIEW**

The Board's decision should be upheld unless its conclusions are not supported by substantial evidence or the Board failed to apply the proper legal standard or departed from precedent without reasoned justification. *See Jackson Hosp. Corp. v. NLRB*, 647 F.3d 1137, 1142 (D.C. Cir. 2011) (vacating Board

decision because it was not supported by substantial evidence). In that regard, this Court has noted that it will not uphold an order of the Board when it has "erred in applying established law to the facts of the case." *Jochims v. NLRB*, 480 F.3d 1161, 1167 (D.C. Cir. 2007).

## SUMMARY OF ARGUMENT

The Board and the ALJ's conclusions that Bellagio violated Section 8(a)(1) of the Act are not supported by substantial evidence and are contrary to law.

Bellagio did not violate Garner's *Weingarten* rights and the Board's conclusion that it did so is not supported by substantial evidence. First, although the Board suggests that it can rely on the ALJ's findings to support its determination that a violation occurred, the ALJ made no such findings. *See* Decision 2:29-3:37; 8:10-12:25. The Board should have reversed the ALJ on the basis alone. *See generally J.J. Cassone Bakery, Inc.*, 345 NLRB No. 111 (2005) (ALJ did not articulate a basis for his decision). Second, the record indisputably establishes that Bellagio fully complied with *Weingarten*'s requirements. Garner **admitted** that once he made his request for representation, all questioning stopped and Wiedmeyer advised Garner that he should proceed with procuring a steward. 115:6 (Garner); 185:19-186:5 (Garner admitting no further questions); 46:17 – 48:7 (Wiedmeyer); 93:1-4 (Sanchez).

The record is just as clear that once Garner refused to obtain a steward for himself, Wiedmeyer attempted to do so. Wiedmeyer failed to procure one because Garner refused to share his knowledge about Union representative "Cherise" and because the individual who was in Employee Relations when he called, Jessica Harbaugh, lacked the institutional knowledge to identify a steward available at that time. Unable to procure a representative, Wiedmeyer ended the meeting, and placed Garner on SPI so that Garner could return with a representative and have the benefit of providing the Company with his version of events. 44:21-45:3.

In the Decision, the Board notes the ALJ's conclusion that Garner is a credible witness. Decision at 1, fn.1. If Garner is a credible witness, his admission on cross-examination that he was asked no further questions after he invoked his right under *Weingarten* cannot be nullified by the Board's conjecture and creative interpretation of Wiedmeyer and Sanchez's statements. *Compare* Decision at 1, fn.1 *with* Decision at 4 (dissent). Certainly the Board's determination that Garner was pressed for a written statement is not supported by substantial evidence when it relies on a statement that Garner made out of court and contradicted with his testimony on cross examination. The Board is entitled to deference. It is not entitled to arbitrarily pick and choose witness testimony, relying on Garner's *unsworn* out of court statement and disregarding admissions made under oath during the hearing.

27

The Board's determination that Bellagio violated the Act when it placed Garner on SPI should also be vacated. The General Counsel failed to establish a *prima facie* case. Placing Garner on SPI was neither disciplinary nor adverse, and the Board ignored the record when it reached its conclusion because: 1) it is undisputed that Bellagio's placement of Garner on SPI did not constitute discipline under the collective bargaining agreement which governed the terms and conditions of Garner's employment; 2) the SPI was both paid and brief, lasting less than a day; and, 3) the SPI culminated in a verbal warning which the General Counsel conceded was legitimate.

In reaching its decision, the Board also ignored its own precedent. The Board has repeatedly held that actions like Garner's SPI, which neither constitute formal progressive discipline, nor lay "a foundation for future disciplinary action against [the employee]," do not constitute an adverse action for purposes of establishing a violation of the Act. *Promedica Health Systems Inc*., 343 NLRB 1351, 1351-1352 (2004) (quoting *Trover Clinic*, 280 NLRB 6, 16 (1986)). Moreover, *Weingarten* and Board law expressly authorize employers to suspend investigations when no shop steward is available. 420 U.S. at 256-60; *see also Roadway Express,* 246 NLRB at 1130 (1979) (employer's suspension of two employees who refused to participate in interviews was proper). That is exactly what happened here. The investigation was suspended so that Garner could be

supplied with a shop steward, and Garner was placed on a brief suspension pending investigation to allow for that process to take place. Wiedmeyer wished to complete his investigation and lost faith that Garner could return to work and provide the Five-Diamond service Bellagio requires. The Supreme Court made it clear that the rule set forth in *Weingarten* must be applied in a manner which accommodates industrial reality. The Board did not do so here and it did not supply any reasonable explanation for its departure from its precedent.

The Board's third finding, that Bellagio violated Section 8(a)(1) when Wiedmeyer instructed Garner to comply with the SPI and leave property should also be vacated. Because the Court should find that Bellagio was within its right to place Garner on SPI and remove him from the workplace, it should find, by extension, that Bellagio was entitled to enforce the SPI. It is not coercive to request that an employee comply with a lawful order.

But even if the Court were inclined to sustain the Board's determination, it should not do so here. The Board's Decision and Order is not supported by the legal allegations which were set forth in the Complaint and litigated during the hearing. Indeed, the Board expressly refused to sustain the ALJ's conclusion that Bellagio promulgated an unlawful oral rule. Decision at 1, fn. 3. The Board's decision is instead predicated on a theory not previously presented, that Wiedmeyer "engaged in coercive conduct to compel Garner to cease speaking to

29

coworkers about his discipline." *Id.* Under Board law, a "Respondent should not be expected to defend against other theories that are not part of the General Counsel's case." *Sierra Bullets*, NLRB 242, 243 (2003) (citing *Paul Mueller, Co.*, 332 NLRB 1350 (2000)). The Board's Decision deprived Bellagio of due process and should be vacated.

The Board's fourth conclusion, that Bellagio violated Section 8(a)(1) because Wiedmeyer's entrance into the Bell Department dispatch area somehow constituted unlawful surveillance, is meritless. It is not supported by substantial evidence because the record establishes that the Bell Department dispatch room is a work area through which hundreds of employees and thousands of bags move throughout the day. It is also contrary to Board precedent under which observation of employees engaged in open Section 7 activity on company property does not constitute unlawful surveillance. *See, e.g., Aladdin Gaming, LLC*, 345 NLRB 585, 585-586 (2005) (citing *Eddyleon Chocolate Co.*, 301 NLRB 887, 888 (1991)). The Board committed plain error in sustaining this allegation. It should be vacated.

## ARGUMENT

In unfair labor practice proceedings, the Board's General Counsel bears the burden of establishing each element of its contentions that an employer violated the Act. *See, e.g., KBM Electronics, Inc.*, 218 NLRB 1352, 1359 (1975). That "burden never shifts, and … the discrediting of any of Respondent's evidence does

not, without more, constitute affirmative evidence capable of sustaining or supporting the General Counsel's obligation to prove his case." *Id.*; *see also NLRB v. Joseph Antell, Inc.*, 358 F.2d 880, 882 (1st Cir. 1966) ("The mere disbelief of testimony establishes nothing."). In evaluating whether the Board's Decision and Order is supported by substantial evidence, the Court must consider whether the facts on which the Board relied are sufficient to meet the General Counsel's burden of proof.

**A.**    **The Board's Determination That Bellagio Violated Section 8(a)(1) of the Act Because Wiedmeyer Denied Garner's Request to be Represented By the Union During the May 13th Meeting Is Not Supported By Substantial Evidence.**

In *NLRB v. J. Weingarten*, 420 U.S. 251, 256-60 (1975), the Supreme Court held that employees may refuse to submit to an interview by employer representatives, without a union representative being present, if the employee reasonably believes that the interview may result in discipline. In reaching this conclusion, however, the Court made it clear that exercise of the right may not interfere with legitimate employer prerogatives and that the employer may carry on its inquiry without interviewing the employee if it so chooses. *Id.* Once an employee makes a valid request for representation, an employer has three options: (1) grant the request; (2) discontinue the interview; or (3) offer the employee the choice between continuing the interview unaccompanied by a representative or having no interview at all. *Id.*

There is no dispute that Wiedmeyer stopped asking Garner questions once Garner requested a shop steward.  Garner has admitted this is so on cross-examination:

> Q: Isn't it true that after you requested a *Weingarten* representative that Brian Wiedmeyer stopped asking you any questions about the guest complaint?
>
> A: Yes, that's true.

185:21-24.

There is also no dispute that Wiedmeyer exhausted every reasonable avenue at his disposal in his attempt to locate a steward.  Knowing that there was none in the Bell Department, and also knowing that the departmental "list" to which Garner referred did not exist, he excused himself and contacted Employee Relations.  When Employee Relations could not provide Wiedmeyer with the identity of a steward, Wiedmeyer returned to the interview room and offered to let Garner choose another employee to serve as a representative.  When Garner declined, the interview was discontinued.  Wiedmeyer placed Garner on SPI so that the meeting could reconvene when a steward was available and so that Garner would not return to work in a state that placed satisfaction of Bellagio's demanding customer service standards at risk.

Finally, there is also no dispute that Garner had the ability to end Wiedmeyer's search for a steward the entire time.  But instead of informing

32

Wiedmeyer of the Union representative "Cherise," Garner stayed quiet, instigating the situation.

There is **no** *Weingarten* violation on these facts. *Weingarten* does not require Bellagio to locate Garner's shop steward, and Wiedmeyer's inability to obtain one does not establish a violation of the Act since by Garner's own admission, Wiedmeyer and Sanchez stopped the interview once he invoked his *Weingarten* right. *See Roadway Express,* 246 NLRB at 1130 ("we believe that the burden of informing unit members of the designation of [shop stewards] is one more appropriately borne by the bargaining agent"); *see also Pacific Gas & Elec. Co.,* 253 NLRB 1143 (1981) (no obligation by employer to provide shop steward of choice).

In its Decision, the Board's Majority ignored these uncontroverted facts, contending that Wiedmeyer did not stop questioning Garner but instead pressed him for a written statement. That determination is not based on substantial evidence. The ALJ did not find that Wiedmeyer insisted that Garner provide a statement. The ALJ credited the following Garner testimony:

> Garner's Contentions
>
> Garner recounted Wiedmeyer showing him the complaint. He recalled telling him to ask employee relations for a steward list, and suggesting that such a list might also be posted in Berry's office. He said that Wiedmeyer placed a statement in front of him and told him to fill it out, which he declined to do without a

33

> steward. He added that Wiedmeyer told him that he would simply SPI him and figure it out later. He said that Sanchez and Wiedmeyer eventually left the room to call employee relations and then issued the SPI upon returning. He denied becoming upset, or being emotionally unable to return to serving guests.

Decision at 7. Nowhere does the ALJ hold that Garner was pressed for a statement after he invoked his right under *Weingarten.*

Indeed, as noted above, Garner admitted that Wiedmeyer stopped questioning him under oath during cross-examination. The Board's Majority does not reference that testimony in its decision.[5] Instead, it relies on an unsworn statement that Garner wrote prior to testifying at the hearing before the ALJ. Decision at 1, fn.7. An unsworn, out of court statement which is contradicted by a sworn admission given under cross examination does not constitute substantial evidence. *See Jackson Hosp. Corp.*, 647 F.3d at 1142.

## B. The Board's Determination That Bellagio Violated Section 8(a)(1) of the Act By Placing Garner On SPI Should Be Vacated.

The Board's conclusion that Bellagio violated Sections 8(a)(1) of the Act when it placed Garner on SPI should also be reversed. To establish unlawful discipline under *Wright Line*, the General Counsel must first prove, by a

---

[5]     The Board also attempts to supplement its holding by referencing Wiedmeyer and Sanchez' statements. Decision at 1, fn. 7. But as explained in Member Johnson's dissent, the Board's reading of those statements is not faithful to their text. Member Johnson quotes the statements, confirming there is no indication that either individual pressed Garner for a statement after he requested a shop steward. Decision at 4-5.

preponderance of the evidence, that the employee was subjected to an adverse employment action.

The General Counsel did not satisfy that burden in this case. Garner's placement on SPI had no impact on his employment. It lasted less than 24 hours. It is not considered disciplinary under the collective bargaining agreement which governs the terms and conditions of his employment. And, Garner was fully compensated.

As Moore explained:

> SPI is a holding pattern. It stands for a suspension pending investigation, and it's when something has happened in the workplace where we either need to conduct an investigation or something has happened in the workplace. We need to have a resolution before we return the employee to work. It's a holding pattern. It's not discipline in and of itself. It's just a holding pattern.

631:2-8. Garner's treatment was consistent with this policy. The SPI was not tracked as discipline. It lasted less than 24 hours, and Garner he was compensated for all of his time. Its purpose was to prevent Garner from entering guest service and generating additional customer complaints. The break also allowed Garner time to obtain a steward and return for a due process meeting. This is consistent with, not contrary to, *Weingarten*.

The Board has repeatedly held that actions like Garner's SPI, which neither constitute formal progressive discipline, nor lay "a foundation for future

disciplinary action against [the employee]," do not constitute an adverse action for purposes of establishing a violation of the Act.[6] *Promedica Health Systems Inc*., 343 NLRB 1351, 1351-1352 (2004) (quoting *Trover Clinic*, 280 NLRB 6, 16 (1986)).  For example, in *Lancaster Fairfield Community Hospital*, 311 NLRB 401 (1993), the Board found that an employer did not violate Section 8(a)(3) by issuing a "conference report" to an employee for wearing a union pin, because there was no evidence that the conference report was "even a preliminary step in the progressive disciplinary system."  *Id.* at 403.  The Board found no violation because "the General Counsel has failed to prove that the conference report is part of the Respondent's formal disciplinary procedure or that it is even a preliminary step in the progressive disciplinary system."  *Id.*; *see also Veolia Transp. Servs*., 363 NLRB No. 98 (Jan. 20, 2016) (coaching and counseling do not constitute discipline because, in part, it is not considered discipline under the applicable collective bargaining agreement); *see also Alan Ritchey*, 359 NLRB No. 40 (2012) (holding that suspension pending investigations do not have a material impact on employment and therefore do not constitute a change in the terms and conditions of employment which requires bargaining).

---

[6]     There are Board decisions in which a "suspension pending investigation" is indisputably disciplinary and the last step in a disciplinary system before termination.  That is not this case.  As Moore explained in detail, Bellagio does not use SPI in that way, and it is not disciplinary under the applicable collective bargaining agreement.

The Board has also found that suspensions pending investigation do not constitute discipline in another context: the cases in which the Board considers whether an employee is a supervisor within the meaning of Section 2(11) of the Act. *See Jochims*, 480 F.3d at 1170-1171 (collecting authority in the supervisor context and explaining that even written warnings placed into personnel files may not constitute discipline); *735 Putnam Pike Operations, LLC v. NLRB*, 474 Fed. Appx. 782, 783 (D.C. Cir. 2012) (write-ups which do not constitute "final and authoritative disciplinary actions" because they have "no negative effects on the reviewed employees' job status or pay" do not constitute discipline); *Frenchtown Acquisition Co. v. NLRB*, 683 F.3d 298, 306-309 (6th Cir. 2012) (a charge nurse's ability to impose corrective counseling did not constitute discipline because it was not considered discipline under the applicable collective bargaining agreement).

Finally, federal circuit and district courts have repeatedly held that actions like the SPI issued in this case do not constitute an adverse employment action for purposes of federal anti-discrimination laws. *See Stewart v. Evans*, 348 U.S. App. D.C. 382, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("to establish an adverse personnel action in the absence of diminution of pay or benefits, plaintiff must show an action with materially adverse consequences affecting the terms, conditions, or privileges of employment."); *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015) ("A paid suspension pending an investigation of an employee's alleged

wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision."); *see also Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]dministrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action."); *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891-92 (8th Cir. 2005); *Von Gunten v. Maryland*, 243 F.3d 858,869 (4th Cir. 2001) (holding that "placing [an employee] on administrative leave with pay for a short time to allow investigation" is not an adverse action for retaliation purposes), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); *Breaux v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000) (placement on paid administrative leave is not an adverse action for purposes of a First Amendment retaliation claim); *Doe v. Gates*, 828 F. Supp. 2d 266, 270-271 (D.D.C. 2011) ("Although adverse employment actions "are not confined to hirings, firings, promotions, or other discrete incidents," *Holcomb v. Powell*, 433 F.3d 889, 902, 369 U.S. App. D.C. 122 (D.C. Cir. 2006), to establish an adverse employment action in a discrimination case, "a plaintiff must show 'materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment such that a trier of fact could find objectively tangible harm.'").

Although the Board appears to believe that Wiedmeyer acted improperly because he wished to complete his investigation, that belief does not establish a violation of the Act. Once an employee requests representation, an employer may wait for the steward to arrive, or stop asking questions, end the interview and proceed with its investigation. *See, e.g., Pacific Gas & Electric Company*, 253 NLRB 1143, 1143 (1981) (discussing *Weingarten*). That is exactly what happened in this case. Once Garner requested representation, Wiedmeyer stopped asking questions, attempted to locate a steward, and finding that one was not available to him, discontinued the interview and placed Garner on SPI. The SPI lasted less than 24 hours. It ended the following day after the due process meeting. There is no basis in Board law for finding that the SPI or Wiedmeyer's desire to conduct an investigation was improper, or that such a desire would lead Wiedmeyer to retaliate against an employee with whom he had been working for years.

The imposition of SPI in this case was consistent with Bellagio's imposition of SPI in other cases. Susan Moore testified that SPI's are part of Bellagio's standard process for handling workplace incidents. 646:9-651:6. SPI's are not tracked, but Moore testified that in her experience, roughly 5% of the SPI's issued at Bellagio are issued solely as "cooling off periods." *Id.* Given that Moore has been employed by Bellagio since 2001, and conducts several SPI's per week, even 5% is a large number. *Id.*

39

As Moore explained, the use of SPI in this situation was consistent with Company standards and legitimate under *Wright Line*:

> Bryan Garner was insisting that Brian Wiedmeyer get him a shop steward. The meeting became agitated and combative, and so the end result was that he placed him on SPI until we could have due process meeting with a shop steward there. Brian Wiedmeyer had called our office trying to secure a shop steward, but we don't have a list of shop stewards. The admin could not find one for him. Jessica didn't have a list for him, so he placed the employee on SPI so we could conduct a due process meeting the following day.

637:17-638:3.

The only rationale advanced in this case for the Board's decision is its contention that placing an employee on a paid investigatory suspension amounted to an adverse employment action because of a potential chilling effect. Decision at 3. Member Johnson responded to this assertion in his dissent and the Court should adopt his reasoning because the Board has provided no explanation for its departure from established precedent:

> I vehemently disagree with my colleagues in their finding that either a mere instruction to an employee to leave the workplace or the "prospect of discipline" will have "a coercive chilling effect, whether not discipline is imposed." This is simply circular logic that would make any continuation of a typical investigation--which frequently involves an instruction to the subject employee to go home and uniformly involves at least a prospect of discipline--an automatic adverse action. Weingarten cannot be interpreted so that the invocation of the right automatically shuts down an employer's

> entire ability to investigate a workplace issue. Weingarten protects the employee from involuntary personal involvement in an investigatory interview that could result in discipline; the Supreme Court never intended that it be an overall paralytic to investigations.

Decision at 5, fn. 9.

## C.     The Board's Determination That Bellagio Violated Section 8(a)(1) of the Act Because Wiedmeyer Asked Garner To Leave The Premises After Being Placed On SPI Should Be Vacated.

The Board's determination that Bellagio violated Section 8(a)(1) when Wiedmeyer instructed Garner to stop talking to his coworker and leave the premises because he had been placed on SPI should also be vacated.

First, as noted above, the Board has long held that employers are entitled to place employees who refuse to participate in investigatory interviews on suspension and remove them from the workplace. Indeed, in *Roadway Express,* 246 NLRB at 1130, the Board found no violation when an employer placed two employees on disciplinary suspension because they refused to cooperate when the employer requested that they make themselves available for an interview. In this case, Wiedmeyer did not place Garner on disciplinary suspension. Here merely sought to enforce a legitimate and lawful SPI. There is nothing inherently coercive about taking such action.

Just as importantly, there can be no dispute that the Board's finding that Bellagio violated the Act relies on a theory, factual findings and a rationale that was

41

not advanced by the General Counsel in the Complaint or at the hearing. At the hearing, the General Counsel asserted that Wiedmeyer promulgated an overly broad oral rule. The ALJ sustained that allegation. On appeal, the Board concluded that the theory articulated by the ALJ and the General Counsel could not survive scrutiny because Wiedmeyer had not, in fact, promulgated an overly broad oral rule. Decision at 1, fn.1. But instead of dismissing the allegation, the Board advanced a new basis for liability and found Bellagio in violation of the Act without first giving Bellagio an opportunity to respond.

Due process requires that Bellagio has "meaningful notice of a charge and a full and fair opportunity to litigate it." *Lamar Central Outdoor,* 343 NLRB 261, 265 (2004). The Board's Decision deprived Bellagio of due process and should be vacated. *Sierra Bullets*, NLRB 242, 243 (2003) (citing *Paul Mueller, Co*., 332 NLRB 1350 (2000)).

**D.    The Board's Determination That Bellagio Violated Section 8(a)(1) of the Act Because Wiedmeyer Observed Garner Speaking To A Coworker In The Bell Department Dispatch Room Should Be Vacated.**

The Board's holding that Bellagio engaged in unlawful surveillance when Wiedmeyer encountered Garner in the Bell Department dispatch room should also be vacated. It is not supported by substantial evidence nor is it consistent with established law.

42

"The test for determining whether an employer engages in unlawful surveillance, or unlawfully creates the impression of surveillance, is an objective one and involves the determination of whether the employer's conduct, under the circumstances, was such as would tend to interfere with, restrain or coerce employees in the exercise  of the rights guaranteed under Section 7 of the Act." *Holsum de P.R., Inc*., 344 NLRB 694, 708-709 (2005).

Here, Wiedmeyer saw Garner speaking to another employee in the dispatch room and then walked to the door to ensure that Garner was headed off property. As noted above, the dispatch room is a work area.  It is one of the busiest work areas in the Bell Department.  Wiedmeyer and other supervisors go there continuously throughout the day.  It is well-established that when employees elect to conduct their organizational activity openly on company property, "observation of such activities by an employer is not unlawful." *Sunshine Piping, Inc*., 350 NLRB 1186, 1193-1194 (2007); *Nu-Line Industries, Inc.*, 302 NLRB 1, 2-3 (1991) ("an employer's mere observation of open, public, union activity on or near its property does not constitute unlawful surveillance."); *Southwire Co*., 277 NLRB 377, 378 (1985); *Oates Bros. Fruit & Produce*, 191 NLRB 736 (1971); *Aladdin Gaming, LLC*, 345 NLRB at 585-586.

The idea behind finding "surveillance as a violation of Section 8(a)(1) of the Act is that employees should be free to participate in union organizing campaigns

without the fear that members of management are peering over their shoulders, taking note of who is involved in union activities, and in what particular ways." *Fred'k Wallace & Son, Inc*., 331 N.L.R.B. 914 (2000) (citing *Flexsteel Industries*, 311 NLRB 257 (1993)).  The Board Decision contains no explanation of how it concluded that Wiedmeyer engaged in unlawful surveillance when, in the course of leaving the office after having placed Garner on SPI, he encountered Garner in a high-traffic public work area.  The Board's holding is an extraordinary departure from precedent and appears to conflate its finding that Wiedmeyer supposedly engaged in coercive conduct with a finding that the same facts must also establish an 8(a)(1) surveillance violation.  It should be vacated.

**E.     The Board's Recommended Order and Notice Cannot Be Enforced. They Are Unlawful And Violate Section 10(e) Of The Act Because They Are Not Sufficiently Tailored To The Circumstances Of This Case.**

Finally, the Board's proposed remedial order and notice cannot be enforced because it is contrary to Board precedent and violates Section 10(e) of the Act. *See NLRB v. Thill, Inc*., 980 F.2d 1137, 1142-1143 (7th Cir. 1992); *see also Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900 (1984) (orders must be "sufficiently tailored to expunge only the actual, and not merely speculative, consequences" of the identified unfair labor practice).

There are two significant problems with the order and the notice.  First, Section 1a of the order and the first "We Will Not" clause in the Notice are

44

contrary to Board law because they appear to require Bellagio to provide employees with a chosen *Weingarten* representative regardless of context. Under *Coca-Cola*, 227 NLRB at 1276-1277, an employee is entitled to a specific representative only if that representative is available to participate in the interview without undue delay. Without this limitation, the order and notice are unlawfully broad. They are also not tailored to the facts of this case because Garner did not request a particular representative, nor did Bellagio deny him a particular representative. Garner lacked representation because there were no shop stewards available and he purposefully failed to apprize Wiedmeyer of "Cherise," the Union official in Manja who would have been able to provide a shop steward. Thus ordering Bellagio to comply with such requests is inappropriate.

Second, Section 1d of the order and the fourth "We Will Not" are contrary to Board law. Under appropriate circumstances, such as preventing a coverup or protecting witnesses from retaliation, Bellagio is entitled to require employees to maintain confidentiality. *See, e.g., Verso Paper*, Case No. 30-CA- 089350, NLRB Division of Advice (Jan. 29, 2013). The notice's blanket prohibition against any such rule impermissibly constricts that right and is not tailored to the facts of this case.

45

## <u>CONCLUSION</u>

For the reasons set forth above, the Bellagio's Petition to Vacate the Board's

August 20, 2015 Decision and Order should be granted.

February 29, 2016

JACKSON LEWIS P.C.

By:    _____/s/ Paul T. Trimmer_____
       Paul T. Trimmer
       3800 Howard Hughes Parkway
       Suite 600
       Las Vegas, Nevada 89169
       Telephone:  (702) 921-2460
       Facsimile:  (702) 921-2461
       *Attorneys for Employer*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Circuit Rule 32-1, I certify that this Corrected Opening Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this Corrected Opening Brief contains 10,481 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that this Corrected Opening Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Corrected Opening Brief has been prepared using Times New Roman 14-point font, a proportionately spaced typeface.

Dated this 29th day of February, 2016.

JACKSON LEWIS P.C.

_____/s/ Paul T. Trimmer_____
Paul T. Trimmer
3800 Howard Hughes Parkway
Suite 600
Las Vegas, Nevada  89169

## <u>CERTIFICATE OF SERVICE</u>

In addition to filing this **Corrected Opening Brief** in the above captioned matter via the Court's electronic filing system, we hereby certify that copies have been served this 29th day of February, 2016, by First Class Mail, upon:

Linda Dreeben
Rebecca Johnston
Kira Vol
National Labor Relations Board
1099 – 14th Street, N.W.
Washington, D.C. 20570

Mr. Gary Shinners
Office of Executive Secretary
National Labor Relations Board
1099 – 14th Street, N.W.
Washington, D.C. 20570-0001

Mr. Gabor B. Garner
2680 Blairgowrie Drive
Henderson, NV 89044-0221

/s/    Paul T. Trimmer
An Employee of Jackson Lewis P.C.

4819-7635-8446, v. 1